# TEXAS COURT OF APPEALS REPORTS.

## AUSTIN TERM, 1891.

### DICK DUNCAN v. THE STATE.

*No. 6694. Decided June 17.*

1. **Continuance—New Trial.**—The defendant did not put his character in issue. There were a number of his neighbors present at the trial by whom his character could have been proved, but he did not call them to testify thereto. *Held*, that absent testimony by which he expected to prove good character was immaterial, did not afford good ground for a continuance, and the overruling of such application did not constitute ground for a new trial.

2. **Same.**—Absent testimony by which defendant expected to prove that as soon as he learned he was charged with the murder he voluntarily surrendered to the sheriff did not entitle the defendant to a new trial, his application for continuance for such testimony having been refused; because on the trial such absent testimony was fully supplied by the testimony of another witness, and the fact of such voluntary surrender was not controverted by the State.

3. **Same.**—Absent testimony which is in conflict with testimony adduced by the defendant on the trial, and in view of all the evidence in the case is not probably true, does not entitle the defendant to a new trial, his application for a continuance therefor having been refused.

4. **Charge of the Court—Declarations of Defendant—Abstract Propositions of Law.**—As an abstract proposition of law an instruction that "the declarations of the defendant put in evidence by the State are to be taken as true, unless inconsistent in themselves or contradicted by other evidence, and. the State is bound thereby," is correct; but the trial court is not required to give in charge to the jury, because requested, every correct abstract proposition of law; and in this case it was not error to refuse to instruct the jury in the proposition above quoted.

5. **Murder — Evidence.** — See circumstantial evidence *held* sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Maverick. Tried below before Hon. Winchester Kelso.

The opinion summarizes the facts of the case, but as the evidence is circumstantial and the case one of importance and more than usually interesting the Reporter considers it proper to give the evidence in full as it is set forth in the record. It is as follows:

Tom Hawkins testified as follows, to-wit: I live in San Saba County, Texas. Have lived there since 1874. I knew the Williamson family who lived in San Saba County, Texas. This family lived within four hundred or five hundred yards of where I lived in San Saba County for the last four or five years, up to the time they left there, which was

the last of January, 1889. I have never seen this family or any member of said family since they moved from San Saba County in January of this year. There were four members of this family—the mother, two daughters, and one son. I think the old lady Williamson, the mother of the daughters and the son, was about 50 years of age. Mrs. Levonia Homes, the oldest daughter, who was a widow, I think, was about 28 or 30 years of age. Ben Williamson, the son, was a young man I think about 21 or 22 years of age. Beulah Williamson was about 16 or 17 years of age. Some time in January of this year, about the first of the month, the defendant Dick Duncan bought Mrs. Williamson's place in San Saba County. He was to pay her $400 for it. He (defendant) told me this. The defendant Dick Duncan lives in San Saba County, Texas, about two miles from where I live. I lived between the place where the Williamson family lived and where the defendant Dick Duncan lives. I have known the defendant many years [identifies him in court]. In January of this year, 1889, and I think between the 15th and 20th of the month, one night about 9 o'clock, there was a two-horse wagon passed my house coming from the general direction of the place where the defendant lived and going in the direction of Mrs. Williamson's place. In a few minutes after the wagon passed there was some one on horseback passed my house. Whoever this was came from the same direction that the wagon came from and went in the direction of Mrs. Williamson's place. I could hear the noise of the wagon that passed my house that night until it reached Mrs. Williamson's, and then it stopped. I say it stopped from the fact that the noise made by a moving wagon ceased soon after this wagon stopped at Mrs. Williamson's place. That night I heard a noise up at Mrs. Williamson's house which sounded like the loading of a wagon with boxes and such like. About 11 o'clock of the same night I heard the noise of a wagon start from Mrs. Williamson's house. This wagon did not come back by my house, but went up the river when it left Mrs. Williamson's. I never saw any of the Williamson family in San Saba County since that night. After the wagon had left Mrs. Williamson's house that night, and in a very short time thereafter, some one came back on horseback, passing my house from the direction of Mrs. Williamson's, and went in the general direction of the place where the defendant lived. I had understood that the defendant was to move the Williamson family from San Saba County. I am not positive that the defendant told me this, but think he did. About 9 o'clock of the morning following the night I heard the wagon loaded at Mrs. Williamson's house, as above stated, I was at my blacksmith shop near my house when the defendant Dick Duncan and Jim McDaniel came to the shop from the direction of Mrs. Williamson's place. They were in a two-horse wagon, which wagon and horses belonged to Jim McDaniel. When they stopped the defendant said, "Mr. Hawkins, what

have you done with your neighbors?" alluding to the Williamson family. I answered, "Dick, they left last night, but they will be back within a month," to which the defendant replied, "No, by G—d, they will never come back." The defendant had in the wagon at the time some bedsteads and a kitchen safe and some other household plunder he said he had bought from Mrs. Williamson's family. My son, Ed Hawkins, and Jim McDaniel were present and heard this conversation. Walley Hawkins, another son of mine, and Hugh Hawkey were a short distance behind the wagon at the time, but don't think they were near enough to hear the conversation just detailed between the defendant and myself. The Williamson family was very poor—had no property except the place they sold defendant and seven or eight head of cattle, a mare and colt. I never knew where defendant was to move the Williamson family to. I was glad they were gone, as the devilish boys in the neighborhood would go to Mrs. Williamson's house and raise such disturbance it annoyed me and my family, and on one occasion I said I would go with a crowd at night and fire guns near her house and see if it would not frighten them and stop so much cutting up at her place. I offered her $600 cash for her place and she refused to take it. The defendant visited her place very frequently and was very intimate with the Williamson family, and the old lady Williamson had great confidence in him. I never heard anything wrong about the old lady Williamson. Mrs. Levonia Homes' reputation was not good, but I never heard anything derogatory to the others. The boys would go there and run over the old lady and she could not help herself. The Williamson family were an ignorant and inoffensive family. I knew all of the family well. Mrs. Levonia Homes, Mrs. Williamson's widowed daughter, who lived with her mother near me and constituted one of the Williamson family and moved with her mother from San Saba County in January last, had two of her upper front teeth out and for the last three or four years she wore false teeth—that is, she had a plate with originally two false teeth in it. These were false and upper teeth. She had lost one of these false teeth out of the plate. I can not say positively how long it had been since she had lost one of the teeth out of this plate, neither can I say which one of the false teeth was out—that is, the right or left. I have seen Mrs. Homes often with her plate and teeth out of her mouth. [Here a plate with one upper false tooth was shown witness.] If this is not Mrs. Homes' plate it is one exactly like hers, but I can not swear positively that it is hers. Mrs. Levonia Homes had peculiar feet, in this: She had large knots on each of her feet where her large toe joined to her foot, and each of her large toes inclined very much in toward her other toes and seemed to rest on the toe next to her large toe, and these knots always showed very plainly on her shoes. The knots resembled what I believe are called bunions. When she left San Saba County, or just prior thereto,

Mrs. Homes wore a rather coarse button shoe. Ben Williamson was a small man about five feet and six or seven inches tall, fair complexion, very little beard, light colored hair, with a very small foot. For some time before the Williamson family left San Saba County Ben wore a white soft hat, blue ducking pants, and a brown ducking coat, coarse boots, about No. 5, and he wore his pants in his boot legs. He wore this suit of clothes for a month prior to his leaving San Saba County. Ben Williamson's upper front teeth were very large and wide apart. His upper teeth next to his front teeth were very sharp and pointed. I have examined two dead persons since I have been in the town of Eagle Pass, one a man, the other a woman. The bodies of these two people were taken up from the graveyard in the town of Eagle Pass this morning, and in the presence of Judge J. A. Bonnett and W. N. Cooke, sheriff of Maverick County, Frank Ward, and my son, Ed Hawkins, who lives with me in San Saba County, Texas. Frank Ward also lives in San Saba County. I identified the bodies. One of these dead bodies was that of Ben Williamson, the other was that of Levonia Homes, sometimes called "Vony Homes." I identified Ben by his teeth and his clothes, a description of which I have already given. I saw Ben Williamson wearing that same suit for at least a month before he left San Saba. The boots and suit of clothes are the same he wore in San Saba County. I identified Levonia Homes by her mouth, the two upper front teeth being out; and the shoes on her dead body had the knots on them I have before described. I would have known these two bodies to be Levonia Homes and Ben Williamson wherever I saw them, and would have searched no further for them had I been looking for their dead bodies. The dead bodies I saw and identified as Mrs. Levonia Homes and Ben Williamson were exhumed this morning in the cemetery here in Eagle Pass. Mrs. Homes' false tooth plate was missing from her mouth when I examined her dead body this morning. I could plainly see the large knots on her feet of which I previously testified on this trial. I have known defendant many years [and identifies him in court].

Ed. Hawkins was the next witness introduced by the State, and was duly sworn and testified he lived in San Saba County, Texas, and was a son of the witness Tom Hawkins. This witness testified substantially to the same facts as the witness Tom Hawkins, describing the preparation for the departure and the departure of the Williamson family from San Saba County, the identity of Ben Williamson and Levonia Homes, and in addition to the facts as testified to by Tom Hawkins this witness saw the defendant Dick Duncan in San Saba County four or five days after the Williamson family had left San Saba County, and that he was present at his father's house when defendant and McDaniel came to his father's shop on the morning after the moving during the night before of the Williamson family, and heard the defendant ask

his (the witness') father, "What have you done with your neighbors?" alluding to the Williamson family, and heard his father reply to defendant, "Dick, they left last night, but they will be back within a month," and heard defendant reply to this, "No, by G—d, they will never come back." Also that he was well acquainted with every member of the Williamson family and was a frequent visitor to the Williamson house, living near them and visiting them almost daily and constantly associated with them all. Have known defendant many years [and identifies him in court].

Frank Ward, being duly sworn, was next introduced by the State, and testified that he lived in San Saba County. This witness also testified substantially as did the witnesses Tom and Ed Hawkins, with the following exceptions: He did not live as near to the Williamson family in San Saba County as the other two witnesses; did not hear the wagon the night the Williamson family left San Saba County. The defendant Dick Duncan told this witness he had bought the Williamson place and he was going to move them from the county. Saw the Williamson family two or three days before they left San Saba County but never learned where they were going. This witness had been acquainted with the Williamson family for fifteen or twenty years, and was very intimate with them. Had worked on their place some, and saw the defendant there often and knew he was very intimate with the whole family and especially Beulah Williamson, the youngest daughter. This witness described more minutely the false teeth worn by Levonia Homes during the last three or four years of her life than the witnesses Tom and Ed Hawkins; stated the left tooth was lost out of the plate before seeing the plate. Identified a plate with one upper tooth shown him as the plate belonging to Levonia Homes. He was very positive that was the plate worn by her; that he had often had the plate in his hand at Mrs. Williamson's, in San Saba County, and examined it very closely. This witness also identified two bodies he had examined in Eagle Pass during this court as Ben Williamson and Levonia Homes, and he swore very positively to the feet and mouth of Levonia Homes, and detailed at length and minutely the means of identification of each of the bodies; identified the clothing of Ben Williamson and described them as the other two witnesses, and in addition described his shirt. Knew Levonia Homes' shoes on her feet by the style and quality and the knots on them made by a knot on her foot where her large toe joined her foot. Also identified her by her mouth with the plate out. He also identified Ben's upper teeth. The proof of the identification of Levonia Homes and Ben Williamson was positive and complete, and so agreed to by counsel. Witness also identified defendant Dick Duncan. The dead bodies identified by witness as Levonia Homes and Ben Williamson were exhumed in the cemetery at this place—Eagle Pass.

Joe S. Clark, sworn for the State, said: I live in San Saba, San Saba County, Texas. I am acquainted with the defendant. Have known him for a number of years. [Identifies him in court.] I also knew the Williamson family in San Saba County. I am engaged in the hardware and implement business in San Saba. Some time in the latter part of January, 1889, defendant purchased from me a new Mitchell two-horse wagon, with bows, sheet, and spring seat. The wagon had my name and place of business painted upon it. Defendant paid part cash for the wagon and I took his note with a lien on the wagon for the balance. The wagon had "Sold by Joe S. Clark, San Saba, Texas," painted on it. Defendant's brother has since paid the balance due me by defendant on the wagon.

Dr. E. A. Brown, sworn for the State, said: I live in El Paso, Texas, and am a dentist by profession. Some three or four years ago I was in San Saba doing dentist work, and among others I remember that I did some work for a woman who served in the capacity of chambermaid at the Dofflemgre Hotel, where I was stopping. I remember that I made a partial plate for her, but can't identify the plate in court as the one, nor can I remember the name of the woman. I recollect that she was a poor woman, and that I made some reduction in the price on that account.

George Baker, being duly sworn, was next introduced by the State. He said: I live in San Saba County. I have known the defendant all his life. [Identifies him.] Some time between the 20th and the last part of January of this year the defendant and Bill Cheney came to my house in San Saba County. They took dinner with me. The defendant inquired of me the way to San Angelo. I gave him directions out through my pasture. He said he was going there to the races. After dinner Bill Cheney went back toward Dick Duncan's and the defendant went off in the direction I had directed him. This was the last time that I saw him until the last of March or the first of April of this year, at which time he was under arrest for the murder of the Williamson family. The defendant was raised in San Saba County, and I think he was well acquainted with the county. I was at the hotel in San Saba and saw the defendant in company with Bill Cheney when he came into town and surrendered to the sheriff.

G. W. Smith was next introduced, being duly sworn, by the State. He said: I live in San Saba County, Texas. I have been well acquainted with the defendant for years. He lives in San Saba County, Texas. Some time in January of this year, I think about the 15th or 20th of the month, the defendant wanted to sell me in San Saba County seven or eight head of cattle and a mare and colt. He said he had bought them from the old lady Williamson, who lived in San Saba County. I did not buy them. I did not know at that time that the Williamson family had left San Saba County. I did not see the defend-

ant any more after the time he tried to sell me the cattle and mare and colt that he said he had bought from Mrs. Williamson until he was arrested for the murder of the Williamson family.

John Hughes was next introduced by the State, and being duly sworn, said: During the months of February and March of this year I was a State Ranger, and was during the months of February and March, with other Rangers, camped at Camp Wood in Edwards County, Texas, which is about ninety miles distant from Eagle Pass, in Maverick County. On the 6th day of February, 1889, the defendant came to our camp at Camp Wood, in Edwards County. He took dinner with us; said he was acquainted with Mr. Outlaw, who was also a Ranger, and inquired where Mr. Outlaw was at that time. He said he lived in Tom Green County, thirteen miles from San Angelo; that he was going to Piedras Negras, Mexico, after his sister, Mrs. Crarey; that he had a family by the name of Jones that he was taking to Eagle Pass. The defendant was riding a small bay or brown horse branded L O V with bar through it, and some other brand that I do not remember. On the next day I saw the defendant riding a small horse branded E L L, and there was a tall, slender man with him, riding the same horse the defendant rode to our camp the day before, who said his name was Jones. They were riding in front of a new looking two-horse wagon, which wagon contained three women and one man. One of the women was an old lady I took to be about 50 years of age, one of the other women I took to be about 25 or 30 years old, and the other looked to be about 16 or 17 years old. The man in the wagon was a young man I supposed to be about 23 or 25 years old. He was light complexioned, wore a white hat a little flopped, had on blue ducking pants. He had on boots with his pants stuffed in his boot legs. They were all traveling south in the direction of Brackett, in Kinney County. They had a bay and roan horse to the wagon. On the 1st day of March this year Sergeant Aten and myself arrested the defendant and the man who was with him on the 7th day of February near our camp in Edwards County, and who, the time we first saw him, said his name was Jones. Also the defendant's brother, Tap Duncan. We arrested them on the west fork of the Nueces River, about one hundred and twenty-five miles from the town of Eagle Pass. They had the same horses and wagon with them when we arrested them that they had when they came by our camp in February and when they had the three women and the young man with them. They did not have either of the women or the young man at this time. We arrested them on suspicion of smuggling. Sergeant Aten told them why he arrested them, and told them he would hold them until we could make an investigation, and he cautioned them that anything they might say would be used in evidence against them. The defendant seemed to be very mad, and cursed William Lockley. Said he was the cause of their arrest. We found some letters on the man

who had claimed his name was Jones when he passed our camp in February when they had the three women and the young man with them. The letters were addressed to Walter Landers. We asked him who Landers was and where he was. He then said his name was Landers, and the name he gave us on the other occasion I have detailed was his nickname, as he was called by his friends "Picnic Jones." We then asked the defendant who the family was they had when they passed our camp in February and represented that they were named Jones. The defendant said the old lady he had with him was his (defendant's) mother, and the two younger ladies were his (defendant's) sisters; that the youngest of the two was married to the young man that was in the wagon with them the day they first passed our camp, and that his name was Thompson; that his brother-in-law Thompson, the young man alluded to, had a cow stealing case against him in Tom Green County and he (defendant) was carrying him out of the country and asked if we blamed him for that. The defendant said he had left the old lady (his mother) and his sister (Mrs. Thompson) and her husband down near Eagle Pass; that his other sister, Mrs. Crarey, had taken the train and gone home. Tap Duncan was four or five miles ahead of the defendant and Landers when we arrested them. He was traveling in a wagon with his father. Their wagon was an old wagon. After we arrested Tap we carried them all three back to Barksdale and placed a complaint against them for carrying pistols. They all three had pistols. We knew they were traveling and we knew travelers had the right to carry pistols. The reason we did this we suspected them of smuggling and wanted to investigate the matter. We had them put under bond and released them. Never saw defendant any more from that time until I saw him at Burnet, where he was having a *habeas corpus* trial. On February 6 and 7, when we first saw defendant and when the three women and young man were with him, they were traveling in a southerly direction toward Brackett and Eagle Pass. It was on the return of the defendant, and while he was going in a northerly direction, that we arrested him on the first day of March. The wagon in which the three women and young man rode on the 7th of February was a new wagon and had the following painted upon it, to-wit, "Sold by Joe. S. Clark, San Saba, Texas," and defendant was driving the same wagon and the same horses when we arrested him on the 1st day of March upon their return. [Identifies defendant Dick Duncan.]

Ira Aten, being duly sworn, was next introduced by the State, and testified substantially as the witness John Hughes as to what transpired at the time of the arrest of the defendant Dick Duncan (whom witness identified), his brother Tap Duncan, and Landers, on the west fork of the Nueces River, in Edwards County, on the 1st day of March, 1889. And in addition witness said: When I first arrested the defendant he pulled from his pocket an envelope containing a letter and tore it up

and threw it down.   I picked it all up and have it here.   Produces the fragments of both the envelope and letter.   The envelope was addressed to R. H. Duncan, Eagle Pass, Texas, was postmarked Brackett, Texas, February 13, 1889.   Postmarked Eagle Pass, Texas, February 14, 1889. The letter is as follows, to-wit:

"*R. H. Duncan:*       "BRACKETTVILLE, TEXAS, Feb. 13th, 1889.

"DEAR SIR—I right to you acording to promise I seen that woman and that money has not come yet but she said if you would go in the jail your self and take a letter from her to him she would put up the money but she will not let Mexicans take him out for he has kild one Mexican and they have said that they would kill him if you will come and get in jail you can talk with him and she will put up the money and you and 2 or 3 more can take him out and if Mexicans has to do the work it will not bee done allso I want to now if you want me to work for you or not I want you to right ass soon ass you get this letter and let me know.   Yours truly                          I."

The witness further said:  I knew G. B. Dunn in his lifetime.   [It had been proved that he died about six weeks since.]   I was present and heard him testify on the *habeas corpus* trial of the defendant at Burnet, Texas, before Judge Blackburn, on the last of March or the first of April this year, wherein the defendant was charged with the murder of the Williamson family, in February of this year, in Maverick County, Texas.   He (the deceased Geo. B. Dunn) was commonly called "Bluff."   Defendant was personally present at this *habeas corpus* trial.   I can give the substance of G. B. Dunn's testimony as given by him on said *habeas corpus* trial, which was as follows:   He said he was justice of the peace of Precinct No. 1, Maverick County, Texas, in February, 1889.   He said he assisted in taking four dead bodies out of the Rio Grande in February of this year.   The first body was that of a woman which seemed to be about 50 years old—was getting gray.   We took this body out of said river on the 26th of February, 1889.   On the 28th of February, 1889, we took out two more bodies, one a man, the other a woman, and on the 1st day of March, 1889, we took from said river the fourth body, which was a woman.   All the bodies had large rocks tied to them weighing from forty to fifty pounds.   Some two weeks after we had buried the bodies we took up the middle-aged woman for the purpose of ascertaining whether or not she had false teeth.   We found that she had an upper plate with one tooth.   The witness Dunn identified the plate in court as the one taken from the mouth of the middle-aged woman.   Dunn testified that the plate originally had two teeth but one had been lost out.   He also said that the skulls of all the dead persons had been crushed in by striking with some blunt instrument, and that the bodies when found were all near the American side of the Rio Grande, and in Maverick County, Texas,

and that an apron had been tied tightly around the neck of one of the women and was tied around the neck when the dead body was found.

James W. Nolan, sworn for the State, said: I live in Kinney County, Texas. Am sheriff of said county, and am now serving my second term as sheriff. I know defendant. I first saw him in the town of Brackett, Kinney County, on Sunday, the 10th day of February, 1889. He was in company with a young man whose name I afterward learned was Landers. They rode into town on horseback and hitched their horses on the plaza and remained about town for three or four hours, and mounted their horses and rode off in the same direction from which they came. Defendant was riding a dark bay horse branded what I took to be L O N with a bar through it, and he was also branded J O T. And the man Landers, whose name I did not then know, was riding a good conditioned sorrel pacing horse branded E L L. The men were both strangers to me, and I was at the time on the lookout for certain parties that it was supposed would pass through there, and for that reason took particular notice of them and their horses. I did not speak to either of them on that day, but the next day, which was Monday, the 11th of February, and early in the morning, I saw defendant in town alone. He was near the court house, talking to Mr. Slater at the time, and I walked up to them, and Mr. Slater introduced me to the defendant as R. H. Duncan. I shook hands with him and remarked that I had seen him in town the day before in company with another young man. He said "Yes, with Landers." I told defendant I knew his father, who had once lived in Kinney County. He said "Yes, he now lives below Eagle Pass, and I am on my way to visit him." He said something about traveling with a wagon which was outside of town, and after talking with him a few minutes he got on his horse and rode off out toward Fred. Mahon's, which is in a westerly direction from town. I again saw defendant on the 18th of February, about a half mile this side of Brackett. He was then riding the sorrel pacing horse ridden on a previous occasion by Landers, and was about fifteen or twenty steps in advance of a new two horse wagon driven by Landers. I think there was a bay and a roan horse in the wagon. They were coming from the direction of Spofford and Eagle Pass and traveling in a northwesterly direction along a road that does not pass through the town of Brackett, but goes out by Mr. Mahon's and the school house. At this time defendant was not dressed as before. He had on a large ducking overcoat and a new Mexican hat.

William Kuhlman, being duly sworn, testified: I first saw the defendant in Brackett, where I live. I played cards with him in the morning and at night. This was Sunday, the 10th day of February, 1889. I am certain as to the date because my employer, Mr. Henacke, had taken out a cockpit license for that day. There was another man with him; I did not hear his name. He was dark complexioned; had

a small black mustache.   The defendant offered to sell me a sorrel horse
the second time I saw him.   Did not see the horse.   The second time I
saw the defendant was six or eight days after the first time, at the sa-
loon where I work.   He asked me where Mr. Cobbs was.   Cobbs is a
gambler.   He said that he had a wagon and two horses near town that
he would like to sell to me.   I did not see them.   I saw him about
three days after this.   He bought a flask of whisky and said that he
had to go and meet a wagon on the hill or somewhere.   He had on a
Mexican hat and leggings.   Witness identified Dick Duncan, the de-
fendant.

J. M. Ballantine, sworn for the State, says:   I am hide and animal
inspector for Kinney County.   I was elected at the last general election
but neglected to qualify until after the time prescribed by law, and
was appointed to the office by the Commissioners Court on the 11th
of February, 1889.   I went to Brackett to qualify and give bond, as the
Commissioners Court was in session on that day and had appointed me
to the office to which I had been elected but had failed to qualify.   I
saw the defendant in Brackett.   He was talking to Mr. Slater and
Sheriff Nolan.   Defendant was sitting down holding a horse.   The horse
was branded L O N.   I give the L O E brand, and hence I noticed the
brand.   I saw the defendant again the same day sixty or seventy yards
from my house.   I live in the outskirts of town.   This was just before
dinner.   He and another man rode up to a wagon and stopped it, and
they put something in the wagon.   It was a new covered wagon.   Had
a sorrel horse tied behind it.   Three women and a man were in the
wagon.   The wagon came right on down the road and went in a south-
west direction and turned into the Eagle Pass road.   Saw the defend-
ant several days afterward pass through Brackett riding the same sorrel
horse that was tied behind the wagon I saw going down with the women
in it.   He went out in a northwest direction toward the Las Morras
Mountain.   When the defendant and the other man put the things in
the wagon they went back to town.   The witness' description of the
man who was with defendant was the same as that given by other wit-
nesses of Landers.

Cross-examined:   The horse may have been branded L O V instead
of L O N, as the hair was long and there was a bar through the brand.

W. W. Collins, sworn for the State:   I live here in Eagle Pass now.
In February, 1889, I was living at Spofford.   Eagle Pass and Spofford
are south from Brackett, and Spofford is on the road from Brackett to
Eagle Pass.   Saw the defendant come into Spofford on the Brackett
road some time about the first of February, 1889.   He was riding a
dark bay or brown horse branded L O N or L O V, I do not know
which.   He rode up near Hobbs' store, got off his horse and took his
Winchester carbine and set it against the fence.   Saw that he had on a
pistol and took him to be a Ranger.   He left going toward Eagle Pass.

Saw him two or three days after that again at Spofford. I thought he had on two pistols. He had the same gun, but the barrel was bent. I think it was bent to one side. He was riding a sorrel horse branded E L L. He left the horse in Mr. Hobbs' stable and went off on the Eagle Pass train that evening. I had seen the sorrel horse branded E L L which defendant was riding. A few days before I saw defendant riding him he was hitched behind a new wagon that had three women and two men in it. One was a young man, tolerably light complexioned, 20 or 22 years old. The other was dark and older. I went out to look at the horse to trade for him. It was a good horse, in pretty good fix. They (the people in the wagon) staid about one and one-half hours and left, going toward Eagle Pass. The next day after the wagon left was when I first saw the defendant. He came in from toward Brackett and left in the direction of Eagle Pass and in the direction the wagon with the three women and two men in it went. I heard the defendant tell Mr. Hobbs that he bent his gun by hitting a burro over the head with it. The first time defendant came to Spofford I examined his gun closely but did not take it in my hands. It was not bent then. When I saw his gun the second time it was bent, so much bent that it attracted my attention and I commented on its bent condition.

Geo. Hobbs, State witness, sworn: I am a merchant and postmaster at Spofford. The first time I saw defendant he and another man rode up in front of my store and inquired the way to Eagle Pass. I directed them and they rode off in that direction. This was about 3 or 4 o'clock in the evening. On the evening of the 20th the defendant returned alone riding a sorrel pacing horse. He put his horse up, came into the room and staid around until the train left for Eagle Pass. He took this train; left horse, saddle, and gun in my charge. The gun was a Winchester carbine and had the magazine bent. He said that he had hit a burro with it. On the 23d the defendant came back on the Eagle Pass train, got his horse and staid just long enough to saddle up. He told me he was going back to Eagle Pass. When he left his horse in the stable and took the train to Eagle Pass he said that he had some horses in Mexico that had been stolen and he was going down to get them. When he returned and got his horse and left on horseback he told me that he had found his horses and had got into some trouble with the Mexicans and had been put in a Mexican jail, and that Shad White had gotten him out and that he owed White $35, and was going to Eagle Pass to sell his horse to pay White, and when he returned he would have money enough to pay his feed bill. When he took the horse away he never returned. On the 24th old man Duncan and Tap came to Spofford in a two-horse wagon and staid two hours. I bought a colt from them; paid $3—$1.50 in Dick's feed bill and $1.50 in groceries. Let them have a quarter inch rope to make wagon lines.

They left, going in the direction of Brackett. The wagon had been used some when they first came to Spofford. Old man Duncan went back to hunt a burro. I have had the burro in my possession since that time. Spofford is thirty-five miles north of Eagle Pass and Brackett ten miles north of Spofford. Spofford is on the route from Eagle Pass to Brackett. Spofford is a very small place—has only about ten houses. There is only one store and postoffice, one saloon, and one eating house. I am positive that it was the 20th of February when defendant left his horse with me, because I charged the feed bill to him and ascertained the date from my books.

Charles Yates, sworn for the State, testified: I am deputy sheriff of Kinney County. On February 11, 1889, I met a new covered wagon about noon one-half mile beyond Spofford, on the Brackett road. There was a man driving and three women in the wagon. There was a sorrel horse behind the wagon. The next day I saw the defendant ride past the depot at Spofford, going in the direction of Eagle Pass. Again, a few days afterward, I saw the defendant ride up to Hobbs' store. He was alone, came from the direction of Eagle Pass, and was riding the same sorrel horse that I had seen tied behind the wagon. He got down at Hobbs' store. I saw him the same day standing on the steps of the Eagle Pass train just before it started.

Howard Leffering, witness for the State, being duly sworn, said: I live at Brackett. In February I had been on the Cibolo, and on the 11th of that month started back to Brackett. I had been down there after cattle, and Gus Windus and myself were that morning talking about the day of the month. It was Monday I saw the defendant camped on Elm, two miles beyond Darling. I camped close to him. There were three men and three women. The defendant was one of the men. One of the women was old and the other two younger. The wagon was coming this way, toward Eagle Pass. They had with them several horses, among them one sorrel horse. I had no conversation with any of them. The old woman was a good sized woman. One of the young women was smaller than the other. I have traveled the road from here to Spofford. It is thinly settled; only three settlements between here and there. The road runs about three miles from Darling Station. Darling is about ten miles this side of Spofford. The defendant when I saw him was two miles the other side of Darling. It is about twenty-eight miles from Eagle Pass to where these parties were camped. They were in camp when I left on the morning of the 12th. Did not see the defendant in Spofford that day. I staid in Spofford until late and did not see him. The parties were in camp when I came to where they were, and I camped near them and we all remained there all night, and when I left the next morning the defendant, the three women, and other two men, were still in camp. This was in Maverick County, Texas.

Gabriel Castro, witness for the State, being duly sworn, said: I live in Eagle Pass. Saw some dead bodies in February or March this year —a man and three women. Saw them at the court house in Maverick County. Did not go near the first corpse or second, but did see the other two, one a man and one a woman. The woman was about 18 years; was dressed. The man had two wounds on the head that appeared to have been made with some blunt instrument. The man was about 20 years old; very little beard; had on blue jeans pants; coarse boots, about No. 7. The wounds appeared to have been caused by a blow with a piece of iron or other blunt instrument. One wound was two inches long, one inch wide. The skull was not broken. The bodies were buried here in Eagle Pass. I afterward disinterred one of the bodies to examine the mouth and take out false teeth. The plate had one tooth. [Witness examines the plate and identifies it as the one taken out of the woman's mouth.] I did not examine this body before it was buried. The one I did examine looked like a girl about 15 years old. It was about fifteen or twenty days after the bodies were buried that I disinterred the body of one of the women to see if she had false teeth. The rocks shown witness were upon the bodies, one weighing a little over forty pounds and the other sixteen pounds. The rope is the same as when I first saw it. These rocks were tied one around the waist of each corpse. When I first saw them they were securely tied around the bodies with old grass rope. I have weighed the rocks and know that one weighs forty pounds and ounces and the other sixteen pounds and ounces. I was sexton at the time the bodies were buried and exhumed the body of one of the women fifteen or twenty days after burial to see if she had a plate with two false teeth in it, and found that she had [and identifies the plate shown him as the one taken from the mouth of the dead woman].

Jacob Meyer, sworn for the State, says: I lived at the coal mines seven miles above Eagle Pass, in Maverick County, Texas. Was there when the dead bodies were found. The first I saw was taken out right by the mines, about fifteen feet from the American shore. Had a rock tied to the body with a rope. The rock I think would weigh from forty to fifty pounds. The rocks and rope in court look like the same that were upon the bodies. [Two stones with ropes tied around them being shown the witness, he testified that they looked like the ones tied around the dead bodies he saw.] Could not tell complexion or age, but thought 14 or 15 years old. Had black hair. The body and hair were wet. Had on button shoes. Could not tell color of clothing. The next body I found was about two miles above the mines—a woman. It was lying on the American bank of the river in Maverick County, Texas. All of the body was out of the water. I could not tell the age. Had on clothing—could not tell what color. The body was very much decomposed and the hair gone. Had a large stone tied around the waist

about the same size as the rest. The next body I saw was below the mine and same day as the other one. It was a man about 26 or 27, I guess. Had on blue pants, black coat, was wet, and could not tell much about it. Had on boots. Had a rock tied about the body, same as the others. I think this was in May, but am not certain. I am a miner. This was about one month before I saw you (the district attorney) at the coal mines. I was the first one to find the body above the mine. The river had been up a little and the body looked as if it had been lodged where it was by the high waters. It had just rained heavily —was raining the day I found the body. The rains that fall here do not cause the river to rise at the coal mines. Where I live and where these bodies were found was in Maverick County, Texas. The water in the Rio Grande in this county is always muddy.

J. A. Bonnett, witness for the State, being duly sworn, said: I am county judge of Maverick County. Was so in February and March, 1889. Saw the bodies of three women and one man who were taken out of the river above Eagle Pass, in Maverick County, Texas. These bodies were buried in the graveyard here in Eagle Pass. About two weeks after the first burial the body of the middle-aged lady was taken up for the purpose of finding if she had false teeth. A plate was found in her mouth. It had formerly two teeth, but now one is broken out. It was out when the plate was taken from her mouth. The plate shown is the one we found in her mouth. All these bodies had wounds upon their heads and appeared to have been inflicted by blows with some blunt instrument, the heads being beat in as if by striking. I saw the two bodies disinterred this morning, the 4th of December. They were the bodies of the man and the middle-aged woman buried by us and found dead above Eagle Pass. These bodies were seen and fully identified by Mr. Frank Ward, Thomas Hawkins, Ed. Hawkins, and Wally Hawkins, as the bodies of Ben Williamson and Levonia Homes. I was present when the bodies were disinterred this morning and identified as being Levonia Homes and Ben Williamson. When the dead bodies were first found they all had wounds upon the heads apparently caused by being beaten or struck with some blunt instrument.

Victor Vales and Juan Garcia, both witnesses for the State, were sworn separately, their testimony being substantially the same, and they testified as to the finding of the bodies of the three women and one man. Described them and their clothing. All the bodies were found on the American side of the river, fifteen to thirty feet from the bank. Three were floating slowly in the water and one drifted ashore. All had rocks tied around their waists weighing from forty to fifty pounds.

Jno. McDaniel, witness for the State, sworn, says: In February, 1889, I lived in Eagle Pass. Saw the defendant on the 16th day of that month. He had on a Mexican hat. Was riding a sorrel pony in good fix. Saw him again about the 21st or 22d of the same month, near Shad White's.

Old man Duncan and Tap were with him the last time. They had a wagon which seemed to have been used about one year. The defendant staid in town that night and I saw him in Hogan's saloon about 9 o'clock. I know that the first time I saw him was on the 16th, because I got some goods that day and had them charged to me.

A. Schwandier, witness for the State, sworn, says: I live in Kinney County. On the 24th of February, 1889, I saw the defendant for the first time twenty miles beyond Brackett, thirty miles from Spofford. He was with a man who called himself Landers. The defendant rode a sorrel horse. Don't remember the brand. Had a rocking gait. Saw brands on all the horses; don't remember them. Saw Landers four or five days before I saw the defendant. He was camped near my place. Had a new Mitchell wagon sold by Clark, of San Saba, and new harness. They came the road from Brackett. Took the road north toward Lost Creek. The defendant staid two nights when he came. When he left he went down the road toward Brackett. He said that his brother-in-law had died in Mexico and he had been down to get the things, and that another wagon was coming up with them. Landers staid in camp two nights after the defendant came. This was about sixty-five miles from here—Eagle Pass. It was the 18th or 19th of February, 1889, that Landers came to my place. Defendant came on the 24th. Had on an overcoat, leggings, and Mexican hat. Had a Winchester carbine. It was bent—bent to one side. Defendant said he lived near San Saba, or Tom Green County, I think he said, on Dove Creek, about eighteen miles from town. The horses that they worked to the wagon were a bay and a roan horse both branded 33 with bar over it. I don't know of my own knowledge that they were being offered for sale in the wagon. Never heard the defendant or any one in his presence offer anything for sale. I heard so.

Louis Charles, witness for the State, sworn: I live near Whistler Postoffice, Kinney County. Saw defendant at my house in Kinney County. I live three or four miles from Mr. Schwandier. It was the last of February, 1889, when I saw him (defendant). I bought a large quilt from the defendant for six bushels of corn. Defendant and the other man offered to sell me a bed, gun, and feather mattress. They asked me $20 for the feather bed. They had six or seven quilts in the wagon. I think the wagon was a new four-horse wagon. I did not have the gun in my hands. There was another old wagon at my ranch. That was two or three days after I bought the quilt.

Cross-examined: I live six or eight hundred yards from Whistler Postoffice. The quilt was nearly all one color on one side, kind of blue; the other side many colors. I gave six bushels corn, worth 50 cents, for the same. I have the quilt here in Eagle Pass.

W. J. Brown, witness for the State, sworn: I live twenty-five miles north of Brackett. Saw the defendant at my house on the night of

23d of February, 1889. Said that he had been to Mexico to get some horses that were stolen from his ranch near San Angelo. That he had trouble and the horses were taken away from him and he was put in jail and fined $45. He was inquiring for a wagon which he said was ahead of him. Mr. Perry, who staid at my house the same night, told defendant that he had seen a wagon. The defendant seemed very much excited, and his conduct was noticed by all present. He would start and look around every time the door was opened. He left after breakfast next morning and went in the direction Mr. Perry told him that he had seen the wagon. I saw no more of him. He had a large belt and I thought it strange that he had no arms. It was Friday that the defendant staid at my house. On the next Tuesday the defendant's father and brother came by my house. They were in a wagon and went north. I have seen the two men who were in the last wagon attending court here as witnesses. One is the father and the other is the brother of defendant.

Tom Perry, being sworn, testified same as last witness, and further that he directed defendant to where he had seen a man and new wagon in camp, and rode a short distance with the defendant, and that when he told defendant where the man with the new wagon was camped defendant replied that he did not camp where he (defendant) had told him to, and that he would learn better next time. Also that defendant told him that he had come from the divide, where he had been hunting game all winter, and had had poor success. I did not hear defendant when he told Mr. Brown he was from Mexico.

Max Stotsenburg, sworn as a witness for State: I live on West Nueces, in Kinney County, twenty miles from Brackett, at Whistler Postoffice. On the 18th or 20th of February, 1889, a man came to the postoffice and wrote a letter. He addressed the letter to R. Duncan. The man was riding a black horse branded D A N. On the 25th of February, 1889, old man Duncan and Tap Duncan came along with a wagon. He camped the same evening; next day came back.

A. W. Haley, witness for the State, sworn: I live in Edwards County, about one hundred and ten miles from Eagle Pass, seventy-five miles this side of Junction City. It is about three hundred miles from Eagle Pass to San Saba. About the last of February, 1889, I saw the defendant near my place. He was riding a sorrel horse branded, I think, L O N on left shoulder. Told me that he had been over to Mexico to move his sister, Mrs. Crarey; that Jeff Crarey had died over there. He inquired the way to Junction City and said that he did not care to go through Barksdale. About that time a new wagon came along. The defendant said that it was his. He told me his name and said that his father and Tap were on behind, and that when they came along to tell them that he had gone by the way of Barksdale. They were traveling north and coming from the direction of Eagle Pass and

Brackett. He had a carbine gun—bent. I noticed the gun particularly, as it was in such position that I could see how much it was bent, and wondered at its being in that condition. When I told defendant my name he said he knew my brother, who formerly lived in San Saba County, and then told me his (defendant's) name.

Shadrick White, sworn for the State, says: I have known the defendant some nine or ten months. First met him in Eagle Pass about the middle of February, 1889. He wanted to sell me a sorrel horse. On the 21st I saw him and his father at Fred Berndt's ranch, where I went to get a corn sheller. This is across the river in Mexico. The defendant was trying to get a work horse from Berndt to work up about Brackett, where the defendant said he had left a wagon. They crossed Mrs. Crarey's things through the custom house on the 22d of February, and I saw the defendant, the old man Duncan, and Tap the evening of the 22d in Eagle Pass. They said that they did not have any money and I paid the duty on the goods. The defendant proposed to let me have his horse, and said that the horse was at Spofford. I was to go up after him, but did not go. I saw the first body that was found above Eagle Pass. It appeared to be an old woman; had some gray hair; the head was bruised up. The next I saw was a man; had on blue pants; did not examine him for wounds. Saw the other two bodies, but they were very much decayed and I did not go to them. I know where the body of the old lady was found. The river flows south at that point and is about two hundred yards wide and tolerably straight. There is stone along on this side of the river like that tied to the bodies and like these in court. There is an old road going into the river above the coal mines about two miles. Some days before the bodies were found I was along this road and saw wagon tracks. The wagon was drawn by horses. It went along the dim road. I trailed it a short distance. It was raining every day or two about that time. Some days after the bodies were found I was up there hunting for traces of the parties who killed them, and I saw a drag where something had been dragged along. It was eight or ten feet long and about eighteen inches wide. It led up to the edge of the water. A rain had fallen after this drag had been made. The dim road on which I saw the wagon tracks leads into an old abandoned ranch on the river, at which nobody has lived for three or four years, and is two miles or so above the coal mines and two or three miles below the nearest ranch. When I first saw this trail the dead bodies had not been found and I knew nothing of their death. When I heard of the bodies being found I immediately remembered the wagon tracks on this old road and went there with the sheriff and others for traces of the murder, but the rains had obliterated the wagon tracks, and all we could find was the place where some object had been dragged to the bluff on the river, where the drag ceased. The country up there is wild enough. Where this

drag was found there are plenty of rocks like those tied to the dead bodies. It was seven or eight days after I first saw the defendant that I crossed the things over. The defendant never brought the horse back after he had agreed to sell him to me and had promised to do so. Crarey and his wife went by the name of Thompson in Mexico. Crarey was my cousin.

A. H. Evans, M. D., being sworn for the State, testified that he was a physician and surgeon by profession and was actively engaged in the practice, and had been for the past eleven years or more. As to how long it would take a dead body to rise to the surface after being thrown in water depended largely on the temperature of the water. In a still pool, in warm or moderately warm weather, it would ordinarily take from three to four days. In water such as the Rio Grande in February or March it would probably take some longer. The generation of gases in the abdominal and chest cavities is what causes the bodies to rise. It would take bodies much longer to rise with weights attached to them than it would bodies without weights, and the time it would take would largely depend on the size of the body and the size of the weight and temperature of water. A body thrown in long enough after death for the gases to have generated would rise much quicker than one thrown in immediately after death.

Theo. Wipff, a witness for the State, sworn, says: I live at Upson, Maverick County, eighteen or nineteen miles from Eagle Pass. I remember of hearing of the bodies that were found in the river. Some days before that I saw a wagon with some men and women in it going in the direction of Eagle Pass. I was about one hundred yards from them. Saw a sorrel horse behind the wagon in good fix. I had a horse just like this one is the reason that I noticed it. I know where the coal mines are. There is a road that leads out to the right between my place and Eagle Pass and goes into the river near the coal mines to an old ranch. There has been no one at the ranch for the past two or three years. The road is a dim one and leads into the river about two miles above the coal mines and was made by the parties who used to live at the old ranch. This old ranch is in Maverick County, Texas.

Mr. Hartenstein, sworn for the State, said: I saw the defendant between the 14th and 20th of February at my store in Eagle Pass. He had a sorrel horse. Saw him with another man. This man was medium sized, dark complexioned, and was riding a roan horse. I saw them the same time at Stewart & Creaton's store. One of them put a sack of something on a horse and they went off up Main Street.

W. N. Cooke, sworn for the State, said: Am sheriff of Maverick County. I saw the bodies of the Williamson family—three women and one man. They were taken out of the river at the coal mines. Had large rocks tied to them. The bodies of Levonia Homes and Ben Williamson were taken up this morning and fully identified by Mr. Ward

and the three Hawkinses. I am well acquainted with the river about the coal mines and above. The country is rough, rocky, and brushy above there. The river is about two hundred yards wide, deep, and no crossing. I know where the witness Wipff lives. There is an old road coming from his place to an old ranch about two miles above the coal mines. The regular crossing on the river is at Eagle Pass, and the next one above is Del Rio, sixty miles above, though the river can be crossed when low by parties well acquainted with it between here and Del Rio, but not with a wagon. The old road goes up the river. It is thirty-five miles above Eagle Pass to where the north Maverick County line strikes the river. Darling Station is in Maverick County. The east county line is eight or nine miles east of Darling. The old road goes from Darling by Wipff's and to the river near where the upper body was found. I know "Bluff" Dunn. He is dead. He was justice of the peace and held the inquest over these bodies. Don't know Landers. He is indicted also for the murder of the Williamson family. I have made every effort to arrest him, but have failed. I don't know where he is. The coal mines are in Maverick County, Texas. It is about thirty-five miles up the Rio Grande to the north line of this county, Maverick.

Berry Ketchum, sworn for the defendant, said: I have known defendant all his life. He has been living part of the time at my place in Tom Green County and part of the time at his mother's place in San Saba County. I live fifteen miles from San Angelo and defendant's mother lives about five miles from San Saba. It is 110 miles from San Angelo to San Saba. Bige Duncan is my brother-in-law, having married my sister, and he is defendant's brother. He (Bige Duncan) lives with me. in Tom Green County. I saw defendant in January, 1889, and loaned him $200 to buy the Williamson place with, in San Saba County. Defendant said that was what he wanted with the money. At the time defendant had other money. I saw him with it, but do not know how much he had. Defendant's mother has horses in several brands. Her brand was 33 with bar over it. Defendant had a sorrel pacing horse branded E L L and had a bay horse branded T (arrow T), and also had a roan horse branded 33 with bar over it. It was not later than the 10th of January, 1889, when I loaned the money to defendant. Defendant claimed both San Saba and Tom Green counties as his home. He had not been in Tom Green County but once in the last two years, and I think that was in 1888. I don't know how long he staid, but it was just a short time. I knew defendant's horses—have ridden them. Where I rode them was at his mother's place, in San Saba County. I don't know where defendant has been all the time. Was not with him. He was out in west Texas a year or so, and part of the time I understood was working cattle for a man by the name of Gillett, in Brewster County. I don't know what year he came back, it was a year or so ago

though.  I don't know where defendant was in 1887.  When defend-
ant came to my house last year I had not seen him for about two years.
Five or six years ago he used to stay at my place some and work cattle.
I am a good friend of defendant's.

John Senterfeit, sworn for defendant, said:  I live in San Saba County.
Am well acquainted with defendant.  Saw him in January, 1889, about
the 10th.  It was between the 1st and 10th.  I was at his mother's house
on San Saba River.  Staid all night there.  Defendant came in while
we were eating supper and a little after dark.  He came from the town
of San Saba, and was in a new two-horse wagon which he had bought
in town that day.  There was another young fellow with him.  They
got some bedding and then got into the wagon and went off toward the
Williamson place.  They came back about 11 o'clock that night.  The
young man who went off with him came back with him.  There were
six or more quilts that they put in the wagon before leaving, just a
bundle.  I am farming some and live twelve or fourteen miles from de-
fendant, in San Saba County.  I don't know the man that was with
defendant on the night in question.  He was a tall, slim man with dark
complexion and black mustache.  I never knew a man by the name of
Landers.  The man came back with defendant that night.  I was not
introduced to him, but I asked his name and was told, but do not re-
member now what it was.  He staid all night there at defendant's place.
When defendant and the man with him returned that night they did
not bring the wagon back with them.  I left next morning and don't
know what became of this man.  He was a stranger to me and I had
never seen him before or since.  Defendant and this man came into the
room where I was when they returned.  The quilts mentioned were
piled out together.  Don't know how many quilts.  I saw no feather
bed taken out and none at the wagon, and if there had been any I would
have seen it.  I saw defendant and his companion get into the wagon
and start.  They had only two horses and they were hitched to the
wagon.  The horse lots are the way they went.  I was at their place
frequently.  If I had been drilled to know this man's name I would
know it.  If I had been drilled not to know it I would not know it.  I
was born in San Saba County, and have known defendant many years.

Tap Duncan, sworn for defendant, said:  I am the brother of defend-
ant.  We live in San Saba County, five miles west of the town of San
Saba.  In January, 1889, a new wagon was brought to our house by de-
fendant just about dark.  Bill Cheney came with him.  After supper
they (defendant and Bill Cheney) left and went up the river with the
wagon.  They put in some quilts and provisions before they left.  They
went west up the river and went by the horse lots and stopped and got
a horse and saddle.  The horses worked to the wagon were a bay and
roan branded in my mother's brand, 33 with bar over it.  These horses
belonged to my mother and the wagon was defendant's.  He had bought

it from Joe S. Clark, in San Saba, that evening. Defendant and Bill Cheney came back that same night about 10 or 11 o'clock. I don't know how they came. They did not bring the wagon back with them. Defendant staid about home four or five days. He owned a sorrel saddle horse branded E L L. I left home on the 31st of January, 1889, to come to Eagle Pass. My sister, Mrs. Crarey, was with me. We went to Goldthwaite in a hack and there took the train. We reached Eagle Pass on the 2d day of February and stopped at the Maverick Hotel. The next day I went across the river into Mexico. Had come to get the property of my sister, Mrs. Crarey, whose husband had died over there, and carry it back to San Saba. I staid till the 22d of February and left. I saw defendant after I came, on the 21st of February, at Fred Berndt's across the river in Mexico. When defendant came we counted up the time. I had been at Fred Berndt's ten days. I got here on the 2d. I had expected to meet the defendant here and was disappointed at having to wait so long. Defendant staid over there at Berndt's until the 19th. He was there every night, but on some days would come across the river to the American side and return to Berndt's at night. He slept every night with me at Fred Berndt's ranch. I was here in Eagle Pass with him. I know Landers and saw him here in Eagle Pass on the 16th of February, 1889. I think that is about the date. To the best of my knowledge it was four days after defendant came. Saw Landers on the main street of Eagle Pass on horseback. He was by himself at the time. I saw him afterward on the same day with defendant. They were on horseback and had a sack of something. I waited half an hour and defendant came back. After that till the 19th defendant was across the river in Mexico. Defendant was riding his sorrel pacing horse, branded E L L, when I saw him with Landers in Eagle Pass—the same horse mentioned before this. The horse was not carried across the river into Mexico. I next saw defendant on the 20th of February at Fred Berndt's ranch, across the river. He came back on the train. Had left his horse at Spofford. He got a horse from a Mexican and came to Berndt's ranch. We crossed Mrs. Crarey's things from Mexico on the 22d of February. They were crossed here at Eagle Pass. Shad White and Fred Berndt helped me to cross them and pay the duties at the custom house. They consisted of household goods, beds, mattresses and quilts. There was one feather bed. I got White to help because he was a cousin to Crarey. White paid the duties; we had not sufficient money. We crossed also a wagon and two horses, one colt and one burro, and a brown bald-faced pony. Defendant helped us to cross them over the ferry. After that the next time I saw defendant was at Whistler Postoffice, in Kinney County. Defendant left here (Eagle Pass) on the 23d. Myself and my father, E. A. Duncan, went in the wagon to Spofford and on the way we lost the burro. At Spofford we sold the colt to Mr. Hobbs. He paid me in

goods and I paid $1.50 defendant owed him for keeping his horse. We reached Spofford on the 24th of February. Left here (Eagle Pass) on the 22d. We went from Spofford to Whistler Postoffice. Got there about two hours before sundown. Whistler is about thirty miles from Spofford in a northerly direction. Defendant was camped near there waiting for us. I saw Louis Charles near there. We went from there to Barksdale and from there to Junction City, Mason, and to San Saba. We were stopped at Barksdale by the Rangers on the charge of carrying pistols. Defendant was also tried for an assault upon William Lockey and acquitted. I know what kind of quilts were put in the wagon at San Saba the night defendant and Cheney brought the wagon to our house. There was one large and several small quilts. One was traded to a Mexican for corn and all the others carried back to San Saba. The new wagon and the bay and roan horses which were branded 33 with bar over it, and which defendant and Bill Cheney had at our house in January, and which they left there in the night with, were the same that defendant and Landers had when we were arrested in Edwards County. This wagon and horses were carried on from there to San Saba County, and have since been sold to parties in San Saba County. Landers had a dark bay horse branded L O V with bar through it, and also J O T.

Cross-examined: Bill Cheney was raised in San Saba County and John Senterfeit was also raised there. They were not acquainted at the time defendant and Cheney left our house in San Saba County with the new wagon, but have gotten acquainted since the beginning of this trial. Our lot is seventy-five yards from the house. On the night defendant and Cheney left with the wagon I went to bed at 9 or 10 o'clock. The wagon left about 8 o'clock. They got the defendant's sorrel horse out of the lot, I suppose. Seven or eight quilts were put in. They were put in for the driver to sleep on. I don't know the driver. I did not ask; was not curious about it at all. Fred Berndt's place is up the river three or four miles from Piedras Negras, in Mexico. Piedras Negras is just across the river from Eagle Pass. Defendant was at Berndt's with me seven days between the 12th and 19th February, and during that time I was not separated from him two hours. We crossed all the things on the 22d. On the 19th defendant left, but returned from Spofford on the train to Eagle Pass on the 20th, and it was then he borrowed the horse from the Mexican and came to Fred Berndt's ranch. We (myself and father) arrived at Spofford on the 24th, about 10 o'clock. We left Eagle Pass late in the evening of the 22d. From the time we left Eagle Pass I did not see defendant until we reached Whistler Postoffice. From Schuarduss' ranch to Whistler is two miles. Defendant was at Whistler on horseback when we reached that place. Landers was not with him. The first time that I saw Landers after seeing him with defendant in Eagle Pass on the 16th was after the

Rangers arrested us five miles beyond Barksdale, in Edwards County. Landers was there with the new wagon drawn by the bay and roan horses branded 33 with bar over it. The two wagons, the one I and my father were in and the one Landers was with, had not been together up to that time. Barksdale is about twenty miles from Whistler. I saw Louis Charles at Whistler. I camped one night between Whistler and Barksdale. Father and defendant camped with me. Defendant was on horseback. The first time I saw the new wagon after defendant and Bill Cheney brought it to our house and left with it the same night, in San Saba, was near Barksdale, in Edwards County, Texas, and after we had been arrested by the Rangers. Mr. and Mrs. Crarey went by the name of Thompson in Mexico. Crarey had forfeited his bond in San Saba County and left. I knew Landers. He went by the name of "Picnic" Jones. I saw him the last of March, 1889. I don't know where the horses and wagon were while defendant was with me at Berndt's ranch. I was not keeping them. No one told me to pay defendant's bill at Mr. Hobbs'.

E. A. Duncan, sworn for defendant, said: I am the father of defendant. The testimony of this witness is substantially the same as that of Tap Duncan, except that he had been living in Mexico near Fred Berndt's house for about one year previous to the 12th of February, 1889, and during that time had not seen defendant nor been in San Saba County, and that after the arrival of defendant, on the 12th of February, as stated by Tap Duncan, defendant and Tap staid every night at Berndt's ranch, in Mexico, but he did not know where they were during the day.

It was also in evidence that Walter Landers, as well as the defendant, was indicted for the murder of each member of the Williamson family, but that they were indicted separately and that Landers had not been arrested. A joint deed from each of the Williamsons to defendant for land in San Saba County, dated January, 1889, was also read in evidence.

*Leigh Burleson*, for appellant.—Appellant Dick Duncan was indicted on May 23, 1889, by the grand jury of Maverick County, charged with the murder of Levonia Homes.

Defendant immediately applied for attachments for his witnesses, but on the 26th day of May the case was continued by agreement, and a telegram to that effect was sent out to the sheriffs to whom attachments had been issued. The case was continued to the November term and set for December 2, 1889. On October 23 defendant again caused attachments to issue for his witnesses to Grimes, San Saba, Midland, and Howard Counties. The case was called for trial December 3, 1889, the State announced ready, and the most important of defendant's witnesses being absent, he made his first application for a continuance,

which was by the court overruled, defendant excepting.  Defendant
was then placed upon trial, which resulted in the jury finding him
guilty of murder in the first degree and assessing the death penalty.
Defendant made a motion for a new trial, which being overruled, he
excepted, giving notice of appeal to this court.

The errors complained of and assigned are three:

1. Overruling defendant's application for a continuance.
2. Refusing special charge asked by the defendant.
3. Overruling defendant's motion for a new trial.

We will consider the first and third together.

The second error was, as follows:  Because the court erred in refus-
ing the special charge asked by defendant, which was as follows:  The
defendant, by his attorney, asks the court to charge the jury "that the
declarations of the defendant put in evidence by the State are to be
taken as true, unless inconsistent within themselves or contradicted by
other evidence."

The court is bound to charge the law upon every phase of the case
as presented by the evidence, especially when so requested.  Knox v.
The State, 11 Texas Ct. App., 63; Ellison v. The State, 11 Texas Ct.
App., 361; Reed v. The State, 9 Texas Ct. App., 305.

The indictment charges the killing to have been done with a gun by
striking, or with some blunt instrument or weapon to the grand jury
unknown.

W. W. Collins and George Hobbs testified that they saw defendant
on February 20, 1889, in Spofford, and that the defendant had a Win-
chester gun, the barrel of which was bent.  George Hobbs, testifying
for the State said:  "The defendant left a Winchester gun in my
charge; the magazine of the gun was bent.  He said that he had hit a
burro with it."  See testimony of W. W. Collins and George Hobbs,
pages 47 and 48 of Transcript.  Several other witnesses also testified
as to the gun being bent.  Hobbs testified that defendant's father and
brother had a burro with them.

Under this state of the case the defendant was entitled to the charge
asked.  The evidence raised the point and the defendant asked a spe-
cial charge upon the same, and being asked, it was reversible error,
whether prejudicial or not to the defendant, the same being properly
excepted to at the time.  See bill of exceptions No. 2.  The charge as
asked may not have been artistically drawn, and it is admitted that it
is broader than the authorities may go, but it is nevertheless the fact
that the explanation made by the defendant and introduced by the
State, explaining a criminating circumstance against him, was in the
case, and the court should, when specially requested by the charge
asked, have given a charge upon the point raised and to have instructed
the jury as to how such evidence, coming as it did from the State, is re-
garded; and we say again that the error, however immaterial it may be,

if properly excepted to and presented in a bill of exception on appeal the statute is mandatory that the conviction shall be set aside without inquiring as to the effect of such error upon the jury, or whether injury resulted to the defendant or not.   Marshall v. The State, 40 Texas, 200; Bishop v. The State, 43 Texas, 390; Heath v. The State, 7 Texas Ct. App., 465; Fury v. The State, 7 Texas Ct. App., 471; Harrison v. The State, 7 Texas Ct. App., 183; McGrew v. The State, 10 Texas Ct. App., 539; Buntain v. The State, 15 Texas Ct. App., 485; Goode v. The State, 16 Texas Ct. App., 411; White v. The State, 17 Texas Ct. App., 188; Niland v. The State, 19 Texas Ct. App., 166; Brown v. The State, 20 Texas Ct. App., 188; Clanton v. The State, 20 Texas Ct. App., 615; Paulin v. The State, 21 Texas Ct. App., 436; Leach v. The State, 22 Texas Ct. App., 279; Jackson v. The State, 22 Texas Ct. App., 442; Jones v. The State, 22 Texas Ct. App., 680; Behrens v. The State, 14 Texas Ct. App., 121; Gentry v. The State, 24 Texas Ct. App., 80.

First and third assignments will be considered together, one being the overruling of a motion for a continuance, and the other the refusal to grant a new trial.   The motion for a continuance showed ample diligence as follows:   On October 22, 1889, defendant caused attachment to issue to Grimes County for Jo Grimes, who resided in said county, and which attachment was returned November 25, that Jo Grimes left the county about two weeks ago to attend the court at Brady as a witness.   Defendant's application showed that said witness was at San Saba the week previous to the presentation of the application, and that he was, by the attachment referred to in the sheriff's return, a witness in court at Brady that met December 9.   Hence it was impossible to have secured the attendance of this witness by any possible diligence. On the 22d of October, 1889, attachment was issued for S. B. Howard, sheriff of San Saba County, which was returned December 2, the day set for the trial of this cause, the return showing that S. B. Howard is held under an attachment from the District Court of San Saba County, that court being in session at that time.   Hence it was not possible to have secured his attendance by any diligence.

To secure the attendance of Jim Miller and Nat Johnson defendant caused, on October 22, attachments to issue to Midland County, the place where he had last heard that said witnesses lived, and again on the 25th of said month, hearing that Nat Johnson might live in Howard County near the Midland County line, he caused an attachment to issue for him to that county.   These attachments were returned and filed November 25, 1889.   The case was set for November 2, 1889, and the defendant showing as reason for not using further diligence, that he did not know at that time to where said witnesses had removed if moved at all.   These attachments were issued on October 22 and 25, 1889, and came to the hands of the several sheriffs thirty days before the cause was set for trial; hence they were issued in ample time, these counties,

Grimes, Midland, and Howard, all being upon the railroad, as is Eagle
Pass, and not requiring over two days time to make the trip to either
of them.   All the other witnesses in the attachment for S. B. Howard
were present and his absence is accounted for.   This is certainly full
and ample diligence.

The State, by her district attorney, controverted this application by
showing no diligence or materiality in what defendant expected to
prove by Jeff Lane, of Lampasas County, or Mrs. Hugh Harkey and
Charley Johnson, of San Saba County, and tried to avoid the materi-
ality by admitting what defendant proposed to prove by D. D. Cass-
well, of Brown County.   We did not set up diligence as to Charley
Johnson, nor what we expected to prove by him, nor what we expected
to prove by Mrs. Hugh Harkey or Jeff Lane, finding their testimony
immaterial.   Nor do we insist on diligence prior to the May court, 1889,
at which time the defendant was indicted, but the record shows that
attachments had been issued, showing that defendant wanted these same
witnesses at that time, to Grimes and Midland Counties on May 25, 1889,
and that upon said case being continued by agreement on May 26 the
sheriffs of said counties were telegraphed to not to bring the witnesses—
case continued.   Defendant caused attachments to be issued in ample
time—nearly a month and a half before this case was set—for said wit-
nesses, to-wit, December 2, 1889.

Now, as to the materiality, defendant sets up the following: By S. B.
Howard, sheriff of San Saba County, where defendant was raised, that
as soon as defendant learned that there was a charge against him he,
the defendant, at once voluntarily came in and surrendered upon this
charge; that he also further expected to prove by said witness his (de-
fendant's) good character as a peaceable, quiet citizen.   There is no evi-
dence contradicting this or showing that the same is not true.   It is
certainly material.

By the witnesses Jo Grimes, Jim Miller and Nat Johnson, defendant
set up that he could prove that on or about February 21, 1890—(Right
here I will call the attention of the court to a patent error in date or a
mistake in the clerk in copying the record; he has it March 21, in place
of February 21.   That this is simply an error will be seen by the next
clause in the testimony proposed to be proved by these parties, to-wit,
that they saw the Williamson family on the next day, and heard of their
bodies being found about a week after that time, also the date as put
down in the assignment of error, and filed at the court, gives the date
as February 21.   I do not suppose that this will be insisted upon, how-
ever, as the whole record shows it to be a mistake.)   These parties would
testify that on or about February 21, say from the 18th to the 25th some
time, they met the defendant, whom they knew well and had known
in San Saba County, in Edwards County, going in the direction of San
Saba County, on the road to Junction City, and that the next day they

saw the Williamson family in camp about seven miles west of Spofford Junction; that they were well acquainted with the Williamson family; that Mrs. Williamson had and exhibited to them a lot of money; that witness cautioned her about showing her money down on the river (meaning the Rio Grande), she having informed them that she was going to move across the river about twenty miles above Eagle Pass, and that she was looking for a man who lived about twenty miles above Eagle Pass to bring a wagon that day and move her across the river.

Was this testimony material and, viewed by the light of the evidence in this case, was it probably true? This question the trial judge decided in the negative, for certainly with the diligence here shown and the death penalty the result, he could not hold the defendant to stricter diligence. If he believed the testimony true, for it was certainly material, he should have granted a new trial. Why not true? It does not contradict the evidence in one single particular. George Hobbs, who is a merchant and fixes the date from his books, says that the defendant came to his store on the 20th and left his horse with him, he going to Eagle Pass on the train; that he came back on the 23d, staid only a few minutes and left. Mr. Nolan, without any means of fixing the date, says that he saw him pass Brackett on the 18th, going in a northeasterly direction. Now all the evidence shows Mr. Nolan to have been mistaken; it must have been on the 23d instead of the 18th. He has no data or memoranda by which he fixes the date as does Mr. Hobbs, the merchant and postmaster, who absolutely fixes the date by reference to his books. The defendant staid with W. J. Brown on the night of the 23d, twenty-five miles from Brackett, which would make it thirty-five miles from Spofford and seventy miles from Eagle Pass. These witnesses, Grimes, Miller and Johnson, saw him there, and the next day, which must have been the 24th, they saw the Williamsons alive and well about seven or eight miles from Spofford. The Williamson family had some money with them and were looking for a man to take them across the river about twenty miles above Eagle Pass. The defendant, by his father and brother, proves that he came to Berndt's house, about three miles from Piedras Negras, on the 12th of February, the very morning he was seen by witness Howard Leffering twenty-eight miles from Eagle Pass with the Williamson family; and he never was seen with them nearer the Rio Grande than twenty-eight miles. The witness Wipff entirely fails to identify the party. He does not know whether it was a new or old wagon; does not pretend to describe any of the parties or the number of them. He saw a sorrel horse behind the wagon; don't know the brand; was a hundred yards off. These bodies were taken out of the river between the 26th of February and March 1. The brother and father of the defendant see him every night and the brother with him all the time, not being absent from him at any time over two hours, from the evening of the 12th to the 19th, when he left

and went to Spofford, which, according to the evidence, was thirty-nine or forty miles from Berndt's ranch.  Hobbs says that he arrives there on the 20th and immediately gets on the train and goes to Eagle Pass, where this brother, father and S. White see him.  On the 21st and 22d he assists crossing Mrs. Thompson's or Crarey's goods over the river, and none of the party having enough money to pay the duties, borrows the amount from the witness, Shadrick White.  He leaves Eagle Pass and arrives at Spofford, according to Mr. Hobbs, again on the 23d, but has not enough money to pay $1.50 charges for keeping his horse.  On the 24th or 25th he trades a quilt for six bushels of corn to a Mexican near Whistler, showing that he had no money at that time.  When searched by the Rangers on the 1st of March, no money was found.

We have reviewed the evidence extensively to show that the testimony of Howard Johnson, Grimes, and Miller was probably true, and that it contradicted no part of the evidence.

This case rests solely upon circumstantial evidence.  The defendant not seen nearer than twenty-five or thirty miles  from where the bodies were found; the place where the homicide was committed never discovered; the bodies found floating in the Rio Grande, a large river with a rapid current, had been up on account of recent rains; no one can tell from where these bodies drifted.  We know the current in all large rivers shifts from one bank to another, and in going five miles would likely change from one bank to the other three or four times.  The defendant pleads an *alibi* that is proved by his brother and father from the 12th to the 19th and by Mr. Hobbs from the 19th to the 24th or 25th, and by the witnesses sought, Grimes, Johnson, and Miller, also that he was in Edwards County and that they saw the deceased family alive after the defendant had started home, and that they camped eight miles from Spofford and were told by them that they were looking for a man (not the defendant) who lived across the river, twenty miles above Eagle Pass.

Under the law as it stood prior to the adoption of the present code, if the motion complied accurately with the requirements of the statute, a first continuance was granted as a matter of right.  Austin v. The State, 42 Texas, 345; Toony v. The State, 5 Texas Ct. App., 163; Jenkins v. The State, 30 Texas, 444.

The court had no discretion.  By the code the court is given the discretion of overruling the motion and hearing the evidence, and if injustice had been done to grant to the defendant a new trial upon motion.

In Garcia v. The State, 15 Texas Court of Appeals, 123, this court held that the probable truth of the absent testimony was shown on trial, although the truth of what was expected to be proved in that case was certainly rendered doubtful by the testimony of witnesses Morris and Jenkins.  In the case at bar we have no conflict, yet in the Garcia case the court say a new trial should have been granted.

In Tyler v. The State, 13 Texas Court of Appeals, 210, this court held, although same was the second conviction for the same offense, that the motion for a new trial should have been granted, although the motion for a continuance, not showing diligence, was properly overruled.

In Mapes v. The State, 14 Texas Court of Appeals, 134, the court held that "by reference to the statement of facts it will be found that there is little, if any, conflict between the evidence of the absent witnesses and that introduced by the State, and it does most clearly appear that the facts alleged in the motion were material and of the first importance."

In the leading and well considered case of Miller v. The State, 18 Texas Court of Appeals, 257, this court says that in determining whether a new trial should be granted based on an application for a continuance the inquiry is, "did the testimony set up by the application for a continuance, viewed in the light of the evidence adduced upon the trial, show said testimony in the application for a continuance to be material? Are the facts stated in the application probably true? If both these questions can reasonably be answered affirmatively, the discretion of the court ceases and the defendant is entitled to a new trial as a matter of right."    \*   \*   \*

As before said, the discretion is not entirely with the trial judge. Before it was simply a matter of diligence without materiality or merit, and was very properly changed as it now stands, compelling the defendant to show the materiality and probable truth of the testimony for which the continuance is sought.    But when that is shown the trial judge's discretion ceases and he must grant the defendant a new trial. Especially should that be the case when the death penalty has been assessed, and that on circumstantial evidence.    In Miller v. The State, above referred to, the defendant relied, as in this case, upon an *alibi*. The defendant sought to prove beside the *alibi*, by the witnesses Johnson, Grimes, and Miller, that on February 23 or 24 he was forty miles from the place where these witnesses saw the deceased and family; that he was on the road to Junction City, and that the deceased after he left was alive and well, and expressed an intention of going with another man than the defendant across the river.    By S. B. Howard his good character, and when first informed that this most horrible crime, the murdering of an entire family, had been charged against him he of his own accord came in and surrendered to the law.    He certainly knew of his guilt or innocence.    Would a man charged with such crime, if he were guilty, come in and surrender?    This, together with his good character, was very material to have been proved, and was not contradicted by anything proved on the trial, shown thereby to be probably true by the evidence.

The further rule laid down in Miller v. The State, above referred to, is "that if the trial court has a doubt because of the questionable truth of the testimony set up in defendant's application for continuance, the doubt should be resolved in favor of the defendant and he be granted a new trial." In Harris v. The State, 18 Texas Court of Appeals, 293, this court again laid down the rule as in the Miller case, and from that time to this has been strictly adhered to in all the cases reported, until it is well established as the law of the land.

This case is based entirely upon circumstantial evidence; no witness saw the defendant nearer than twenty-eight miles of the Rio Grande with the deceased. The State does not show him with them after the 12th of February, early in the morning. There is no motive shown—no ill will, no menaces, no lying in wait, no concerted scheme—nothing of the kind that distinguishes murder of the first degree from every other species of homicide. The facts show that the parties were killed, and that the defendant was seen with them fourteen days before their bodies were found. But when were they killed? How far they had floated in the Rio Grande no one knows, no one pretends to testify.

We do not think that the defendant's life should be taken under the facts as developed in this case without giving him a chance to secure the testimony he applied for and to which we believe he is entitled.

*Leigh Burleson* and *Ward & Faulk*, for the appellant, filed an additional brief, as follows: If the indictment charges that murder was committed by the use of certain means it is incumbent on the State to prove beyond a reasonable doubt that death resulted from use of the means charged.

Ira Aten swears that G. R. Dunn, deceased, testified at the *habeas corpus* trial that all the bodies had large rocks weighing from forty to fifty pounds tied to them; that the skulls of the dead persons had been crushed in by striking with some blunt instrument. That an apron had been tied tightly around the neck of one of the women and was tied around the neck when the body was found.

Gabriel Castro, the sexton: Saw dead bodies of one man and three women; did not go near the first and second corpse, but did see the other two—man and woman. The woman was about 18 years old, dressed. The man had two wounds on the head. Appeared to have been made with some blunt instrument or piece of iron. The wound was two inches long and one inch wide. The skull was not broken. Testified as to rocks. About fifteen or twenty days and also about one year after they had been buried Levonia Homes was disinterred to examine her mouth for false teeth, etc. He was sexton.

Jacob Meyer, one of the parties who found the bodies in the river, and who saw them first, together with Victor Vales and Juan Garcia, say three of the bodies were floating slowly with these large rocks,

weighing forty or fifty pounds, tied to them and the other one drifted to shore. One body was at the mine, two below a short distance, and the other about one mile above. These parties say nothing about wounds of any character on the bodies when they were first found. They say the mine is seven miles above Eagle Pass. Judge Bonnett nor Mr. Dunn was then present, so far as the evidence shows.

Judge J. R. Bonnett says all of the bodies had wounds on them when taken out of the river. The wounds were on the heads and appeared to have been inflicted by blows with some blunt instrument—the heads being beat in as if by striking. When the bodies were first found they had wounds upon the heads apparently caused by being beaten or struck with some blunt instrument.

S. White: The first body seemed to be an old woman; had some gray hairs. The head was bruised up. The second I saw was a man; did not examine for wounds. The other two bodies were very much decomposed and did not examine them. The place where it is supposed by the State that the bodies were thrown into the river was about two miles above the mine. Large rocks are there and a high bluff to the river.

The presumption is the State exhausted all her evidence on this point. The body of Levonia Homes was handled and examined, the head and mouth especially, by the three men who first found her, by the sexton, by the Hawkinses and Ward, and not a word does any of them say about wounds on her head, although the body was exhumed about one month and also one year after burial. If the skull had been crushed in as the reproduced evidence shows, or beat in as Bonnett says, is it not more than probable that some of all these other parties would have noticed it? It is remarkable indeed if they did not, and we submit that it is asking us to draw too much upon our credulity to believe that they did not if such indeed were the facts, and even Bonnett and the dead man (admitting that his testimony is properly reproduced) are not at all satisfactory on the point. "The skulls were crushed or beat in as if struck," etc., do not go into detail and tell the nature, character and size of the wound, how large and where on the heads, and no explanation given at all save a bare statement and conclusion therefrom. Could these wounds not have been inflicted by throwing the bodies down the rugged and rocky bluff of the river? Is it possible for serious looking wounds to be inflicted on the dead bodies after being thrown into the river by coming in contact with hard substances in a swift-floating stream like the Rio Grande? And this is made the more probable that the wounds could have been and were thus inflicted on these bodies when two of the State's witnesses contradict Bonnett and Dunn—saying the man had a bruise two inches long and one inch wide on the head, but skull not broken, and the head of one of the women was merely bruised. To have placed this question beyond cavil, and to make out

such a case as will warrant a conviction, when the bodies were first found they should have been subjected to a medical test to ascertain the cause of death. If the bodies were killed before being thrown into the river, the books have laid down reasonably safe rules to determine that fact. If death came from drowning, that could have been determined by a proper *post mortem* examination when the bodies were first found, and the medical tests to ascertain whether the wounds found on the bodies were inflicted before or after death are equally well settled. Burr. on Cir. Ev., 712–716; 1 Am. Crim. Law., sec. 834; Dean on Med. Juris.

And this leads us up to the submission of first proposition: Does the evidence show to a moral certainty, and to the exclusion of every other reasonable hypothesis, that the deceased came to her death as charged in the second count of the indictment, by wounds inflicted with some blunt instrument? And, second, that the defendant did it?

*W. L. Davidson,* Assistant Attorney-General, for the State.—Appellant complains that the court erred in refusing his application for a continuance and also that the court erred in overruling his motion for a new trial based upon the alleged error in overruling said motion for a continuance. Both rulings of the court are correct. By reference to the application for said continuance and the State's reply thereto it will be seen that the diligence was not sufficient. I will not undertake to rehash the record on this phase of the question, as the more important feature arises upon the court's ruling in refusing the new trial. Willson's Crim. Stats., sec. 2164. The defendant alleges that he expects to prove "by Casswell how and when he got the gun traded by the defendant to a Mexican who is a witness in this case." He does not set out the facts so that it is made to intelligently appear to this court what gun he was speaking of, or when or how he got it, or how it could possibly affect this case. The facts expected to be proved must be set out in the application and in such manner, in connection with other facts when necessary, as to show the relevancy and materiality of the desired testimony. Willson's Crim. Stats., sec. 2165. I have copied above all the facts expected to be proved by the absent witness Casswell. The facts which are expected to be shown by the witness must be stated definitely. Mere inferences, or negations, or conclusions, or vague, indefinite allegations, will not suffice. Willson's Crim. Stats., sec. 2165; Grissom v. The State, 8 Texas Ct. App., 386; Thomas v. The State, 17 Texas Ct. App., 437; Williams v. The State, 10 Texas Ct. App., 114; 3 Texas Ct. App., 444. This testimony, as stated, could not have affected the case. The disposition of a gun did not enter into the case. It was not specified what facts would be proved, and it is not material when viewed from the statement of facts. Willson's Crim. Stats., sec. 2186.

Diligence, as stated above, is not sufficient as to any of the named witnesses. Willson's Crim. Stats., sec. 2164. Viewing the record from the standpoint of the motion for a new trial, it will be seen that Howard's testimony would not have been material and would have been only cumulative. He expected to prove by Howard that he (defendant) voluntarily surrendered himself as soon as he knew that he was accused of the murder of the Williamson family. This fact was proved by the witness George Baker, and it was not a controverted fact in the case. The State did not deny it nor in any way discredit that fact. 13 Texas Ct. App., 443; 14 Texas Ct. App., 474. He further expected to prove by said witness that his (defendant's) character for "peace and quietness" was good. He did not put his character in issue, and the State could not do so. He could have proved his character, if good, by several witnesses who testified on the trial who had known him for years and were friendly to him. Tom Hawkins said he "knew defendant many years; lived within two miles of him." Ed Hawkins testified to same facts as Tom Hawkins. Frank Ward testified that he lived in San Saba County, and testified substantially as did the two Hawkins. Joe S. Clark "knew him for a number of years." George Baker: "I have known the defendant all his life." G. W. Smith: "I have been well acquainted with the defendant for years."

For defendant Berry Ketchum testified: "I have known defendant all his life;" defendant lived "part of the time at my place," etc. Defendant's brother married witness' sister. John Senterfeit said: "Am well acquainted with defendant. Was his friend and lived in same county with him." Tap Duncan was defendant's brother, and of course knew him. E. A. Duncan was defendant's father, and knew him. Both of these witnesses testified in the case.

Defendant was raised in San Saba County, of which county Howard was sheriff, and these witnesses all resided in San Saba County except Senterfeit.

Defendant did not put his character in issue. He could have done so, and if it was a good character, as he expected to prove by Howard, why did he not prove it? He can not complain if it was within his power to supply the absent testimony on the trial and he failed to do so. Wooldridge v. The State, 13 Texas Ct. App., 443; Nolan v. The State, 14 Texas Ct. App., 474. If defendant's character was a good one in San Saba County, or as known by Howard, it would be a little singular that this one witness alone in that county would have known that fact, although his very near neighbors and his friends and family are produced and testify in court and are not asked by him as to his character. One witness is hardly sufficient to prove character in a community or among the people where he lived. One witness is not enough where character is impeached. 3 Texas Ct. App., 48; Butler v. The State.

Defendant alleges that he expected to prove by Joe Grimes, Nat Johnson, and Joe Miller, that he was the owner of a sorrel horse branded E L L which was in possession of defendant in Edwards County. It is only too true that defendant owned that horse, and for his safety it became too strong and potent a fact, and connected defendant with the murder of the deceased, and was too strongly proved to admit of doubt as to his ownership. If defendant relied upon his ownership of that horse as a fact to relieve him, or as tending to do so, of any connection with the crime, that fact was fully proved and not contested. Ketchum and Tap Duncan both proved it fully. That horse was a fatal incident in the record of this case and points to defendant as guilty. He further expected to prove by these same three witnesses that they saw him in the western part of Edwards County one day, and on the following day they saw Mrs. Williamson, daughters, and son, some six or seven miles west of Spofford Junction, in Kinney County. An examination of the facts will show the distance to be about eighty or ninety miles. It is shown in this connection that defendant and the Williamson family were together at Brackett, at Spofford; that he camped with the Williamsons the night after they passed Spofford Junction. Between Brackett and Spofford they were together. In fact Hughes saw them together in the western part of Edwards County, and from there to the night they all camped beyond Spofford Junction they are found together along the route of travel. From there they seem to have deflected to the river (Rio Grande), toward the old ranch where or near where the murder occurred; hence they were not seen any more. They were carried off from traveled roads and murdered and thrown in the river. See Ballantine's, Nolan's, Huhlman's, Collins', Leffering's, Hobbs', and Hughes' testimony.

Besides there is not one intimation in the record that either of these witnesses were in that section of the State at that time. No one saw them. The allegations put all three of the witnesses together one day in Edwards County, and the succeeding day eighty or ninety miles away in another county, and all together each time, yet no one ever heard of them anywhere in that country, and everybody seems to have seen the defendant and the Williamsons. It is a little strange that three men from the extreme ends of Texas and living hundreds of miles apart could have so suddenly congregated together in that *terra incognita* known as Edwards County, and have gone scurrying through eighty or ninety miles of civilization and then disappeared as mysteriously as they came. A comet flying along that Rio Grande border would not have attracted more attention or created more excitement. Stonewall Jackson's flying visit to the Federal armies in the "Valley" did not startle those lazy soldiers and their officers more than the rapid passage of these three witnesses would have caused even among the wide awake inhabitants of that rugged Rio Grande border. Like the spirits of the

wind they came, saw and departed, silent as the dead. They were invisible, and neither ate, slept nor drank during their flying visit. They came like the dew of twilight and faded before the morning light. This part of the defendant's continuance as to expected facts is not "probably true." Who ever heard of these witnesses in all that country or in the statement of facts? Defendant would not claim in his assignment of error (No. 1) that their evidence would have been probably true. He says it was material. How can this be if it is not true and can't be proved? Said testimony is not material. If Duncan was in Edwards County as alleged in said motion, how can his claim have any semblance of truth in it that he was in Mexico so shortly afterward? The record fully demonstrates that these witnesses were not in that country at that time, and it fully demonstrates that what was expected to be proved by them can not be true. Willson's Crim. Stats., sec. 2186.

It was not necessary to charge upon the isolated fact of the bent gun and the defendant's explanation why said gun was so bent. The court gave a full charge upon the law of circumstantial evidence, and this was sufficient upon this phase of the case. The explanation did not relate to the killing or the crime. Defendant was not accused of the murder, nor that he had bent the gun in the tragedy. It was a statement as to the cause of the condition of the gun. This went to the jury as a fact with the other facts. If this fact should have been charged upon then every fact should have been culled out and specially charged upon and its effect limited. "Reasonable explanation" applies to possession of recently stolen property. The bending of the gun was not an extraneous crime, nor is it extraneous matter admitted for a specific purpose incidental to the main issue, but it was evidence admitted directly to prove the main issue, and a special charge was not necessary.

The evidence, though circumstantial, shows that defendant and Landers murdered the Williamson family and threw them into the Rio Grande. See the facts.

WHITE, PRESIDING JUDGE.—Appellant was indicted, tried and convicted in Maverick County on the indictment charging him with the murder of one Levonia Homes, the said murder being alleged to have been committed on or about the 24th of February, 1889. There were three counts in the indictment—one charging a murder by striking her with a gun, another by striking her with some blunt instrument or weapon to the grand jurors unknown, and the last by assaulting her in some way and manner and by some means and with weapons to the grand jurors unknown. The defendant was found guilty of murder in the first degree and his punishment assessed at death.

Defendant's motion for a new trial in the lower court contains in brief the matters which he assigns as error upon his appeal, and the grounds of said motion are as follows: "First, because the court erred in not granting defendant's motion for a continuance, the absent witnesses being material and the probable truth of their testimony as well as the materiality being shown upon the trial of this cause; second, because the court erred in refusing special charge asked by the defendant; third, because the verdict is not supported by the evidence, but is contrary to same and should be set aside; fourth, because the verdict is contrary to the law."

There were but two bills of exception reserved during the progress of the trial in the court below, one to the overruling of defendant's motion for a continuance and the other to the refusal to give the special requested instruction asked in behalf of defendant.

In order to illustrate the points necessary to be determined with regard to the application for continuance and other issues involved, we will be compelled to give a brief summary of the salient features of the evidence as presented in the record.

It appears that there was a family by the name of Williamson who lived in San Saba County, with whom this defendant is shown to have been quite intimate. The family consisted of a mother, a widowed daughter some 28 or 30 years of age, a son some 20 or 22 years of age, and a daughter between 15 and 17 years of age. The widowed daughter's name was Levonia Homes, and she was the subject of the murder involved in this case. The family was poor, having only a small tract of land, some household furniture, and a few head of cows and horses. The defendant seems to have gained the confidence of the old lady and she finally sold him her land and her other property. Just after this sale the defendant moved the family with his own wagon, just bought, and team from San Saba County in a westerly direction, it being stated that the family were being moved to Mexico. They started in his wagon from San Saba County the last of January, 1889. They left at night between the 15th and 20th of January. It is shown that the defendant was present and assisted them in packing the things into the wagon the night they left. About 9 o'clock the next morning the defendant stopped at the blacksmith shop of witness Hawkins and said, "Mr. Hawkins, what have you done with your neighbors?" alluding to the Williamson family. Hawkins says: "I answered, 'Dick, they left last night but they will be back within a month;' to which the defendant replied, 'No, by G—d, they will never come back.'"

A few days after the Williamson family started the defendant left San Saba County and was frequently seen on the road afterward in company with the family traveling along in the direction of Eagle Pass. On the 6th day of February the defendant came to a Ranger camp, Camp Wood, in Edwards County, and took dinner with the

Rangers and said that he was going to Piedras Negras, Mexico, after his sister; that he had a family by the name of Jones whom he was taking to Eagle Pass.  At that time there was a man by the name of Landers with the party who seemed to be a friend of the defendant, and also to be traveling with the party, and from there on down to the neighborhood of the Rio Grande these parties were seen together, Landers being with them.  On the 11th of February Leffering, a witness for the State, saw these parties, the defendant being one of them, two miles on the other side of Darling Station and about twenty-eight miles from Eagle Pass.  The State's witness Wipff says he lives at Upson, in Maverick County, eighteen or nineteen miles from Eagle Pass.  He describes the parties in the wagon just as the other witnesses do, and he says he saw the wagon going in the direction of Eagle Pass some days before he heard that some dead bodies were found in the Rio Grande.  This is the last time the parties are seen together prior to the finding of the dead bodies in the river, but this witness does not fix the date.  Between this witness' house and Eagle Pass there was a fork in the road, one of the forks being an old deserted dim road, which goes toward the river near the coal mine to an old ranch, but there is no ford where this dim road reaches the river.  The defendant was seen in the town of Eagle Pass by the witness Hartenstein between the 14th and 20th of February.  His whereabouts between the 11th and 14th of February is unknown by any of State witnesses, or other citizens of Eagle Pass, conceding that Hartenstein saw him as early as the 14th.  The witness John McDaniel says he saw the defendant in the town of Eagle Pass on the 15th of February.  If that was the date he first arrived in Eagle Pass and the time at which Hartenstein saw him there (between the 14th and 20th), his whereabouts for five days, between the 11th and 16th, is unknown by any of the State's witnesses, nor is he seen by anybody at or near Eagle Pass during that time save his brother and his father, who testify that he arrived at Berndt's ranch across the Rio Grande in Mexico, where they were stopping, on the 12th of February, 1889, and remained with them every night at Berndt's ranch until the 19th of February, and Tap Duncan testified that during that time he was not separated from the defendant at any one time for more than two hours.

On the 22d of February the defendant, his brother Tap Duncan, and his father E. A. Duncan, and Shad White, who was a witness for the State, testify that they crossed the household property belonging to Mrs. Crarey, a sister of defendant, over the Rio Grande to Eagle Pass. These things belonging to Mrs. Crarey were loaded in an old wagon by E. A. Duncan, father of the defendant, and this wagon was the one in which they (E. A. and Tap Duncan) traveled back to San Saba County, they leaving Eagle Pass late on the evening of the 22d. The new wagon in which the defendant had moved the Williamson family out to the

Rio Grande from San Saba County was not seen by Tap Duncan or E. A. Duncan until they were arrested near Barksdale, in Edwards County, Texas, where defendant and Landers had also been arrested by the Rangers.  The witnesses Aten and Hughes, who were Rangers, say that they arrested these parties in Edwards County, one hundred and twenty-five miles from Eagle Pass, on the 1st of March, on a suspicion of smuggling goods across the Rio Grande.  Speaking of this arrest Hughes says:  "We asked the defendant who the family was he had when they passed our camp in February and represented that they were named Jones.  The defendant said the old lady he had with him was his (defendant's) mother, and that the two young ladies were his (defendant's) sisters; that the younger was married to the young man in the wagon with them the first day they passed our camp, and his name was Thompson; that his brother-in-law Thompson, the young man alluded to, had a cow-stealing case against him in Tom Green County and he (the defendant) was moving him out of the country, and asked if we blamed him for that.  The defendant said he had left the old lady (his mother) and his sister (Mrs. Thompson) and her husband down near Eagle Pass, and that his other sister, Mrs. Crarey, had taken the train and gone home."  This was the account the defendant gave of the missing family on his arrest the 1st of March, before these parties got together and were arrested by the Rangers (that is, the defendant, Tap Duncan, and his father E. A. Duncan, and Landers, with the two wagons), in Edwards County.

The witness Louis Charles testifies that on the last of February, 1889, he bought a large quilt from the defendant for six bushels of corn, and the defendant and the other man (by testimony shown to be Landers) offered to sell him a bed, gun, and feather mattress.  They asked him $20 for the feather bed.  They had six or seven quilts in the wagon. He describes the wagon as a new one and says the old one passed his house two or three days afterward.

The testimony shows that the dead bodies of the Williamson family were taken out of the Rio Grande, the first on the 26th of February, which was that of an old lady; and the second, a man and a woman, on the 28th of February, and on the first day of March the fourth body, which was the body of a woman.  Each of these bodies had tied to them rocks weighing from forty to fifty pounds, and were found near the coal mines above mentioned in Maverick County.  The skulls of all the dead bodies had been crushed by striking them with some blunt instrument.  These bodies were, after the inquest held over them, buried in the cemetery in Eagle Pass.  Subsequently the bodies of Levonia Homes and Ben Williamson were exhumed and examined and fully identified by several of their neighbors from San Saba County. This sufficiently states the facts necessary to a proper understanding of

the merits involved in defendant's application for a continuance and other issues in the case.

Defendant states in his application for continuance that he expected to prove by the absent witness S. B. Howard, sheriff of San Saba County, that he (defendant) was a man of good character in the county of San Saba, where he was raised, and also that as soon as the defendant learned that there was a charge against him for this murder he voluntarily came in and surrendered to the sheriff. This evidence was not material in the light of the other testimony in the case. Defendant did not put his character as to his being a peaceable and quiet citizen in issue. There were a number of his neighbors from San Saba County who were present and testified at the trial by whom he could have proved his good character, if such was his reputation in San Saba County, as well as by the sheriff, and they were not asked as to his character. It was proved by the State's witness George Baker that defendant did voluntarily surrender to the sheriff of San Saba County, and this fact was not in issue or denied by the State.

By the witnesses Joe Bryan, Jim Miller, and Nat Johnson, defendant's application states that he could prove that on or about the 21st of February, 1889, they saw the defendant in the western portion of Edwards County on the road to Junction City, and they had all been well acquainted with defendant for many years; that the next day they saw Mrs. Williamson, her daughter Mrs. Homes, Ben Williamson, and Beulah Williamson in camp some six or seven miles west of Spofford Junction, in Kinney County; that they were all well acquainted with the Williamson family; that Mrs. Williamson told them that she had sold her place in San Saba County and was going to Mexico; that she was looking for a man who lived across the river some twenty miles above Eagle Pass to bring a wagon that day and take her over there; that she showed witness a lot of money that she said she got for her place.

This proposed testimony is positively contradicted in so far as defendant is concerned by defendant's own witnesses, his father and his brother, E. A. Duncan and Tap Duncan, who testify, as we have above seen, that on the 21st of February he was at Berndt's ranch in Mexico with them, and that he did not leave Eagle Pass until the evening of the 22d. So far as their statement as to seeing Mrs. Williamson and her family at that time is concerned we think it is equally as improbable and untrue. The court did not err in overruling defendant's application for a continuance.

The court did not err in refusing defendant's special requested instruction as shown by his bill of exceptions No. 2. This instruction is in the following language: "Defendant by his attorney asks the court to charge the jury that the declarations of the defendant put in evidence by the State are to be taken as true unless inconsistent in

themselves or contradicted by other evidence, and the State is bound thereby."

This instruction abstractly considered is doubtless a sound proposition in law. The court, however, is not bound to charge because requested every abstract proposition of law that may be correct. In this case the court has charged the law applicable to the facts in the case and has applied the law to the facts legitimately in the case, as we think correctly and fully, and there was no error in refusing to give the special requested instruction.

But it is contended the evidence is insufficient to support the verdict and judgment; that no motive was shown for the perpetration of the deed on the part of this defendant, and that the circumstances as developed by the evidence are too inconclusive as to his guilt. We do not know with certainty what the motives were that prompted this horrible murder of a whole family. It might have been the money the old lady had received for her property. We do believe, however, that the evidence is sufficiently conclusive that this defendant was a guilty party to the murder. He has attempted to show that none of the property of the Williamson family was ever found in his possession after he separated from them, and he has been very particular in showing that a large number of quilts were brought off from his mother's house on the night he went to move the Williamson family from San Saba County. He was also very particular in showing that the household furniture of his sister, Mrs. Crarey, was brought back from Mexico, but that property it will be remembered went in the wagon that conveyed his father and brother back to San Saba County, and none of that property went into the wagon in which he moved the Williamson family to Mexico. His brother Tap Duncan testified that the two wagons were never together until they were arrested on the 1st of March by the Rangers in Edwards County. The evidence of Charles shows that several days prior to this last date, and before these wagons had gotten together, defendant offered to sell him among other things a feather bed, for which he asked him $20, and a mattress. Where this defendant got the feather bed and mattress has never been accounted for by any witness in the case. He did not take them from his mother's house on the night he started with so many quilts to move the Williamson family to the Rio Grande. It is true that they are not shown to have been the property of the Williamson family, but the defendant has been so particular in accounting for all the other property in his possession that it strikes us as remarkably strange that he could not account for these articles.

We are of the opinion, after a most mature consideration of the evidence in this case, that it is entirely satisfactory and most conclusive that this defendant and those acting with him are the parties who so foully and inhumanly exterminated this whole family. If guilty there

can be no question as to the character of the crime or degree of punishment deserved. The jury in the court below have said that the defendant deserves death for his crime. We are not disposed to interfere with the judgment, and it is therefore in all things affirmed.

*Affirmed.*

Davidson, J., being disqualified, did not sit in this case.